FILED

2026 Apr-10  PM 02:16
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHWESTERN DIVISION

| | | |
|---|---|---|
| **PORSHA L. PRIDE-FORT,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  3:24-cv-00739-MHH** |
| | } | |
| **UNITED PARCEL SERVICE, INC.,** | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION AND ORDER

Porsha L. Pride-Fort has sued her current employer, United Parcel Service, Inc., for racial and sexual discrimination, harassment, and retaliation under Title VII of the Civil Rights Act of 1964.  (Doc. 1-1).  UPS has asked the Court to enter summary judgment in its favor on Ms. Pride-Fort's claims pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (Doc. 18).  This opinion addresses UPS's motion. The Court begins with an overview of the legal standard that governs motions for summary judgment.  Then, consistent with that standard, the Court summarizes the evidence in the summary judgment record and analyzes Ms. Pride-Fort's Title VII claims based on the summary judgment evidence.

1

## I.

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). To demonstrate a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which a jury could reasonably find for the [non-moving party]." *Terrell v. Sec'y, Dep't of Veterans Affs.*, 98 F.4th 1343, 1351 (11th Cir. 2024), *cert. denied sub nom. Terrell v. McDonough*, 145 S. Ct. 273 (2024) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)) (alteration in *Terrell*).

When considering a motion for summary judgment, a district court must view the evidence in the record in the light most favorable to the non-moving party and draw reasonable inferences in favor of the non-moving party. *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015). "A litigant's self-serving

2

statements based on personal knowledge or observation can defeat summary judgment." *United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018); *see also Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) ("To be sure, Feliciano's sworn statements are self-serving, but that alone does not permit us to disregard them at the summary judgment stage."). Even if a district court doubts the veracity of the evidence, the court cannot make credibility determinations; that is the work of a factfinder. *Feliciano*, 707 F.3d at 1252 (citing *Anderson*, 477 U.S. at 255). Still, "[c]ontentions based on 'mere speculation and conjecture' cannot defeat summary judgment." *Terrell*, 98 F.4th at 1351 (quoting *Cincinnati Ins. Co. v. Metro. Props., Inc.*, 806 F.2d 1541, 1544 (11th Cir. 1986)). Applying this standard, the Court presents the summary judgment evidence in the light most favorable to Ms. Pride-Fort.

## II.

Ms. Pride-Fort is an African American woman. (Doc. 1-1, p. 8). In 2018, UPS hired Ms. Pride-Fort as a part-time dispatch supervisor at a distribution center in Florence, Alabama. (Doc. 28-2, pp. 8–9, tpp. 32:20–33:4, 34:1–6). After UPS hired Ms. Pride-Fort, another UPS employee asked to work the dispatch supervisor position. (Doc. 28-2, p. 9, tp. 33:7–19). UPS accommodated the employee's request and moved Ms. Pride-Fort to a part-time package center supervisor position. (Doc.

28-2, p. 9, tp. 33:7–19).[1]  As a package center supervisor, Ms. Pride-Fort handles customer concerns, finds missing packages, monitors drivers while they deliver packages, tracks vehicle fuel and oil use, and coordinates packages transferred to other shippers for delivery.  (Doc. 28-2, p. 9, tpp. 35:19–36:10).

Two other people work as part-time package center supervisors at UPS's Florence center, an African American woman named Shawauntae Williams and a white woman named Caleigh Stanfield.  (Doc. 19-1, p. 3, ¶ 7).  Ms. Williams works the morning shift.  (Doc. 28-2, p. 13, tp. 51:14–23).  Ms. Pride-Fort works the mid-day shift, from 12:00 pm to 5:00 pm.  (Doc. 28-2, pp. 9, 10, tpp. 36:11–15, 37:14–22).[2]  Ms. Stanfield works the evening shift.  (Doc. 28-2, p. 13, tp. 52:4–11).  Ms. Williams, Ms. Pride-Fort, and Ms. Stanfield share an office.  (Doc. 28-2, p. 13, tp. 49:8–13).  They report to full-time supervisor Theron "Chris" Little.  (Doc. 19-1, p. 3, ¶ 7).

UPS employs several other part-time supervisors at the Florence center, including a white woman named Lindsey Garrison and a white man named Joshua Brandon.  (Doc, 19-1, p. 3, ¶ 8).  Ms. Garrison is  a dispatch supervisor.  (Doc. 19-1, p. 3, ¶ 8).  As a dispatch supervisor, Ms. Garrison analyzes and plans the center's

---

[1] Ms. Pride-Fort refers to her part-time package center supervisor position as "OMS."  (*See* Doc. 20, p. 3; Doc. 28-2, p. 9, tp. 33:1–23).

[2] Ms. Pride-Fort works these hours Tuesday through Friday.  (Doc. 28-2, p. 10, tp. 37:14–22).  On Mondays, Ms. Pride-Fort works from 3pm until 8pm.  (Doc. 28-2, p. 10, tp. 37:14–22).

package dispatch, analyzes previous dispatch results, supervises load modifications, and supervises the maintenance of technology systems.  (Doc. 19-3, p. 4, ¶ 8b).  Mr. Brandon is a preload supervisor.  (Doc. 19-1, p. 3, ¶ 8).  As a preload supervisor, Mr. Brandon trains and supervises package handlers and clerks on safety and productivity, assists with package concerns like damaged packages and incorrect addresses, and performs other preload-related tasks.  (Doc. 19-3, p. 4, ¶ 8c).  Ms. Garrison and Mr. Brandon report to full-time supervisor Zach Howell.  (Doc. 19-1, p. 3, ¶ 8).

Mr. Little and Mr. Howell report to the Florence Center Business Manager.  (Doc. 19-3, pp. 2–3, ¶ 3).  Before 2021, Bryan Payant was the center manager.  (Doc. 19-3, pp. 2–3, ¶ 3).  Charles "Chuck" Sims was the Florence center manager from April 2021 until July 2024.  (Doc. 19-1, p. 2, ¶¶ 1, 2; Doc. 19-3, pp. 2–3, ¶ 3).

Ms. Pride-Fort raises a plethora of grievances against UPS to support her discrimination and retaliation claims.  Many of Ms. Pride-Fort's grievances mirror claims that her mother raised in a separate discrimination suit against UPS.[3]

---

[3] In 2023, Ponsetta Simmons, Ms. Pride-Fort's mother, sued UPS for discrimination and retaliation under Title VII.  *See* (Doc. 28-2, p. 9, tpp. 34:22–35:4); Comp. ¶¶ 2–6, *Simmons v. United Parcel Service, Inc.*, 3:23-cv-01128-CLS (N.D. Ala.), Dkt. No. 1-1.  Judge Smith granted UPS's motion for summary judgment on Ms. Simmons's claims. *See* Memo Op. at 27, 3:23-cv-01128-CLS (March 19, 2025), Dkt. No. 28; *Simmons v. United Parcel Serv., Inc.*, No. 3:23-CV-1128-CLS, 2025 WL 868207, at *10 (N.D. Ala. Mar. 19, 2025).  The Eleventh Circuit affirmed.  *Simmons v. United Parcel Serv. Inc*, No. 25-11261, 2026 WL 457812, at *1 (11th Cir. Feb. 18, 2026).  The Court takes judicial notice of the court records in Ms. Simmons's case. *See Bobadilla v. Aurora Loan Services, LLC*, 478 Fed. Appx. 625, 627 (11th Cir. 2012) (pursuant to Rule 201 of the Federal

Ms. Pride-Fort alleges that UPS discriminatorily restricted her hours. (*See* Doc. 22-3, p. 4, no. 5). In 2022, UPS's "upper management" reduced part-time supervisors' hours pursuant to a nation-wide "cost-saving" effort. (Doc. 19-1, p. 3, ¶ 9; Doc. 28-2, p. 14, tp. 56:1–10). According to Ms. Pride-Fort, Mr. Sims gave Ms. Garrison extra hours after the hours reduction but would not give her and Ms. Williams extra hours. (Doc. 28-2, p. 24, tpp. 95:1–96:16). Ms. Pride-Fort asserts that Ms. Stanfield worked more hours than her. (*See* Doc. 22-3, p. 2, no. 1). Ms. Williams, Ms. Pride-Fort, and Ms. Stanfield worked the following hours in 2023 and 2024:

| 2023 Hours | | | |
|---|---|---|---|
| | Ms. Pride-Fort | Ms. Williams | Ms. Stanfield |
| January | 78.25 | 125.18 | 108.83 |
| February | 98.5 | 123.03 | 92.29 |
| March | 118.45 | 109.95 | 130.71 |
| April | 101.74 | 119.14 | 109.74 |
| May | 113.32 | 100.02 | 126.17 |
| June | 80.1 | 150.02 | 94.62 |
| July | 91.61 | 109.72 | 99.88 |
| August | 127.09 | 103.58 | 134.6 |
| September | 100.8 | 121.69 | 72.28 |
| October | 89.58 | 131.99 | 116.05 |
| November | 131.6 | 91.1 | 95.37 |
| December | 104.28 | 133.88 | 99.39 |
| Total | 1235.32 | 1419.3 | 1279.93 |

Rules of Evidence, "[a] court may take judicial notice of its own records and the records of inferior courts.") (quoting *United States v. Rey*, 811 F.2d 1453, 1457 n.5 (11th Cir.1987)).

| 2024 Hours | | | |
|---|---|---|---|
| | Ms. Pride-Fort | Ms. Williams | Ms. Stanfield |
| January | 87.4 | 99.67 | 81.21 |
| February | 85.76 | 101.79 | 96.2 |
| March | 105 | 85 | 95.48 |
| April | 106 | 95 | 79.43 |
| May | 104.99 | 105 | 101.18 |
| June | 74.83 | 88.28 | 75.64 |
| July | 84.25 | 75 | 102.13 |
| August | 103.41 | 110 | 104.4 |
| September | 69.75 | 105 | 75.31 |
| October | 122.17 | 77.5 | 110.25 |
| November | 107.24 | 82.04 | 101.29 |
| December | 89.7 | 147.46 | 93.11 |
| Total | 1140.5 | 1171.74 | 1115.63 |

(Doc. 19-3, pp. 64–66, 68–70).

According to Ms. Pride-Fort, Ms. Stanfield often arrived late for her scheduled shifts and left her shifts early. (*See* Doc. 28-2, pp. 13, 25, tpp. 52:4–18, 100:4–7). Ms. Pride-Fort heard "everyone talk[] about . . . how [Ms. Stanfield] leaves early" and on "a few" occasions observed that Ms. Stanfield was not at the Florence center during a scheduled shift. (Doc. 28-2, pp. 13, 14, tpp. 52:12–15, 53:8–18).

Additionally, Mr. Sims purportedly gave Ms. Garrison and Ms. Stanfield extra days off when they "covered" shifts but would not give Ms. Pride-Fort extra days off. (Doc. 28-2, pp. 24, 25, tpp. 93:8–14, 98:23–100:3). Ms. Pride-Fort testified that she knew about Ms. Garrison and Ms. Stanfield's extra days off because Ms.

7

Garrison and Ms. Stanfield told Ms. Pride-Fort that Mr. Sims gave them extra days. (Doc. 28-2, pp. 24, 25, tpp. 93:19–94:18, 99:10–14). Ms. Pride-Fort could not recall when Ms. Garrison and Ms. Stanfield told her this. (Doc. 28, pp. 24, 25, tpp. 94:15–18, 99:12–100:3). UPS's employment records show that Ms. Pride-Fort took 23 personal days in 2023, and Ms. Stanfield took 11 personal days in 2023. (Doc. 19-3, pp. 64, 66). In 2024, Ms. Pride-Fort took 15 personal days; Ms. Stanfield took 13. (Doc. 19-3, pp. 68, 70).

Ms. Pride-Fort alleges that UPS wrongfully denied her opportunities for promotion. Shortly after UPS hired Ms. Pride-Fort in 2018, Ms. Pride-Fort told then-center manager Bryan Payant that she was interested in a full-time dispatch supervisor position. (Doc. 28-2, p. 33, tpp. 130:3–12). In the spring of 2021, Ms. Pride-Fort told Mr. Sims she was interested in a full-time position at UPS. (Doc. 28-2, p. 33, tp. 130:13–21). Ms. Pride-Fort testified that she has applied for "two or three" full-time positions with UPS, but she could not recall what positions she applied for or when she applied. (Doc. 28-2, p. 35, tpp. 139:20–140:16).

Ms. Pride-Fort was interested in a full-time driving position with UPS. (*See* Doc. 28-2, pp. 33–34, tpp. 132:20–133:3). Mr. Sims asked other part-time managers to become drivers. (Doc. 28-2, p. 34, tp. 133:2–19). For instance, Mr. Sims "tr[ied] to get [Ms. Garrison] in the [full-time] dispatch position," but . . . she had to go to driving school and drive on the road for 30 days." (Doc. 28-2, p. 34, tpp. 133:20–

8

134:9).  Mr. Sims never asked Ms. Pride-Fort to become a driver, and Ms. Pride-Fort never applied for a full-time driving position.   (Doc. 28-2, pp. 33–34, tpp. 132:20–133:3).   UPS does not employ black women in permanent delivery driver positions at the Florence center.  (Doc. 28-2, p. 26, tp. 101:6–12).

Ms. Pride-Fort identifies numerous offensive comments that she heard while working for UPS.  "Years ago," Ms. Pride-Fort overheard Mr. Brandon say that black women are lazy.  (Doc. 28-2, p. 26, tpp. 101:6–102:17).  Ms. Pride-Fort did not report Mr. Brandon's comment to the UPS help line, her supervisors, or HR.  (Doc. 28-2, p. 26, tpp. 102:20–103:14).  In 2023, Mr. Little told Ms. Pride-Fort that she would need to "sit on [Mr.] Sims's lap" if she wanted to reschedule her vacation.  (Doc. 28-2, p. 40, tpp. 159:23–160:8).  Ms. Pride-Fort did not report Mr. Little's comment. (Doc. 28-2, p. 40, tp. 160:11–12).

While Mr. Sims was the Florence center manager, he made several offensive comments.  Mr. Sims told people that he was raised by a black woman whom he called "Mammy."  (Doc. 28-2, p. 36, tp. 141:10–15).  Mr. Sims commented about "nappy hair."  (Doc. 28-2, p. 36, tp. 141:1–6).  Mr. Sims told employees that they needed to wear their hair up and once told Ms. Pride-Fort and Ms. Williams that "if a rat got in [their] hair" it would die.  (Doc. 28-2, p. 36, tp. 142:6–14).  Mr. Sims said that "black food" was disgusting.  (Doc. 23, p. 4; Doc. 28-2, p. 36, tp. 141:7–9).  Mr. Sims told Ms. Pride-Fort that when he worked in Mississippi as a delivery

driver, most of his deliveries were to black beauty salons, that the salons smelled, and that their food smelled like dead animals. (Doc. 28-2, p. 37, tpp. 145:22–146:17). Mr. Sims would slur the word "chicken" when speaking to Black employees and once referred to a Black manager as "dog," saying "maybe my dog will want some of that chicken." (Doc. 28-2, p. 37, tpp. 146:18–147:6). Mr. Sims gave Ms. Pride-Fort a bail bond card that he found in "the middle of the road" and told her she must have dropped it outside. (Doc. 28-2, p. 26, tpp. 103:17–104:2). Mr. Sims told a black employee that he was talking too much and would "get [an] MLK day." (Doc. 28-2, p. 31, tpp. 121:13–122:9). Other UPS employees witnessed some of these comments. (*See* Doc. 28-2, p. 38, tp. 149:8–12).[4]

Ms. Pride-Fort did not confront Mr. Sims when he made racially tinged comments and did not report his comments to her supervisors or other UPS officials. (Doc. 28-2, pp. 26, 32, 38, tpp. 104:3–7, 125:2–126:1, tp. 149:1–7). In 2022, Brook Hall, a UPS security person, told Ms. Pride-Fort that she was investigating Mr. Sims's conduct. (Doc. 28-2, p. 38, tpp. 150:3–7, 151:20–152:5). Ms. Pride-Fort told Ms. Hall that Mr. Sims harassed Black employees "on a day-to-day basis." (Doc. 28-2, p. 38, tpp. 151:20–152:5).

---

[4] Ms. Pride-Fort testified that she believes another employee once complained about Mr. Sims's comments, but she does not know whether the employee reported Mr. Sims's comments to the UPS helpline or other authorities. (Doc. 28-2, p. 38, tpp. 149:13–150:2).

Once, a UPS customer subjected Ms. Pride-Fort to racially tinged insults and threats. During a telephone call on December 23, 2022, a customer called Ms. Pride-Fort a "Black bitch," threatened to hang her, and threatened to confront Ms. Pride-Fort at the Florence center. (Doc. 28-2, p. 42, tpp. 165:16–166:15; *see* Doc. 19-3, p. 26). When Ms. Pride-Fort reported the call to Mr. Sims, he asked Ms. Pride-Fort whether the customer was Black or white. (Doc. 28-2, p. 42, tp. 166:19–23). Ms. Pride-Fort responded that the customer sounded white, and Mr. Sims left the facility. (Doc. 28-2, p. 42, tpp. 166:19–167:2). Later, the customer went to the Florence Center, and Ms. Pride-Fort called the police. (Doc. 28-2, p. 42, tp. 167:13–21). Mr. Little and Mr. Howell spoke with the police and barred the customer from returning to the Florence center. (Doc. 28-2, p. 42, tp. 168:8–19; *see* Doc. 19-3, p. 23).

Ms. Pride-Fort's remaining complaints relate to Mr. Sims's conduct while he was the Florence center manager. For example, Ms. Garrison had items hanging on her office walls, but Mr. Sims told Ms. Pride-Fort that she could not hang anything on her office walls. (Doc. 28-2, pp. 29–30, tpp. 113:20–114:3).[5] Mr. Sims once shoved a pack of paper at Ms. Pride-Fort. (Doc. 28-2, p. 26, tp. 104:13–15). In late 2022, Mr. Sims removed UPS hotline posters with information on reporting

---

[5] Ms. Pride-Fort testified that she does not know whether Mr. Sims told Ms. Garrison that she could not hang anything on the walls. (Doc. 28-2, pp. 30–31, tp. 120:16–121:2).

discrimination and harassment.  (*See* Doc. 28-2, pp. 15–16, tpp. 59:20–64:19).[6]  Mr. Sims reposted the help line information in late 2023.  (Doc. 28-2, p. 16, tp. 63:3–15).  In July 2024, Mr. Sims brought watermelon slices for employees at the Florence center.  (Doc. 19-1, p. 4, ¶ 14; Doc. 28-2, p. 21, tp. 84:10–21).[7]

In the spring of 2023, Ms. Pride-Fort contacted the EEOC to report discrimination.  (Doc. 28-2, p. 51, tp. 204:4–19).  Ms. Pride-Fort identified Mr. Sims and Mr. Orson as contact persons for the EEOC.  (Doc. 28-2, p. 52, tp. 205:3–10).  Ms. Pride-Fort believes that the EEOC notified Mr. Sims of her complaints.  (Doc. 28-2, p. 52., tp. 205:3–12).  Ms. Pride-Fort testified that after she contacted the EEOC, Mr. Sims's conduct deteriorated.  (Doc. 28-2, p. 52, tp. 206:14–21).  Mr. Sims would yell at the part-time package center supervisors and "blam[e] [them] for stuff [they] didn't do."  (Doc. 28-2, p. 52, tpp. 206:22–207:21).  Mr. Sims never mentioned Ms. Pride-Fort's call with the EEOC.  (Doc. 28-2, p. 52, tp. 206:5–7).

---

[6] Ms. Williams told Ms. Pride-Fort that Mr. Sims removed the posters.  (Doc. 28-2, p.16, tp. 63:16–20).  Ms. Pride-Fort did not indicate whether Ms. Williams witnessed Mr. Sims remove the posters or learned of their removal from other witnesses.  (*See* Doc. 28-2, p.16, tp. 63:16–20).

[7] Mr. Sims offered Ms. Pride-Fort and another black employee watermelon, and Ms. Pride-Fort "was told" that he only offered black employees watermelon throughout the day.  (Doc. 28-2, p. 22, tp. 87:5–21).  Based on this information, Ms. Pride-Fort testified that Mr. Sims only asked black employees if they wanted watermelon.  (Doc. 28-2, p. 21, tp. 84:10–21).  Mr. Sims attests that he gave watermelon slices to all employees.  (Doc. 19-1, p. 4, ¶ 14).  Because Ms. Pride-Fort lacks personal knowledge of whether Mr. Sims handed watermelon slices to non-black employees, the Court does not credit her testimony.  *See United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018) ("A litigant's self-serving statements based on personal knowledge or observation can defeat summary judgment.").

On October 19, 2023, Ms. Pride-Fort filed an EEOC charge alleging that UPS discriminated against her because of her race and sex.  (Doc. 1-1, pp. 7–8).  Ms. Pride-Fort has not identified alleged retaliatory activity that occurred after she filed her EEOC charge.

Ms. Pride-Fort testified that Mr. Sims's conduct caused her to experience blood pressure issues, anxiety, and depression.  (Doc. 28-2, p. 49, tp. 194:2–17).

### III.

Title VII prohibits employers from discriminating against employees in compensation, terms, conditions, or privileges of employment because of race, sex, and other protected characteristics.  42 U.S.C. § 2000e-2(a)(1).  To succeed on a Title VII discrimination claim, a plaintiff must demonstrate that a protected characteristic "was a motivating factor" for her employer's discriminatory treatment.  *See Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1338 (11th Cir. 2023) (quoting *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1239 (11th Cir. 2016)).

A plaintiff may use the *McDonnell Douglas* burden shifting framework to establish a claim for discrimination.  *Jenkins v. Nell*, 26 F.4th 1243, 1249 (11th Cir. 2022) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).  "Aside from the *McDonnell Douglas* framework, an employee can . . . survive summary judgment by presenting . . . a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker."

*Jenkins*, 26 F.4th at 1250.   Regardless of which framework the employee uses, a district court "must answer the same 'ultimate question'—'whether there is enough evidence to show that the reason for an adverse employment action was illegal discrimination.'"   *Jimenez v. U.S. Att'y Gen.*, 146 F.4th 972, 997 (11th Cir. 2025) (quoting *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 941 (11th Cir. 2023), *cert. denied*, 145 S. Ct. 154 (2024)).

Ms. Pride-Fort  has not established a prima facie case of discrimination under *McDonnell Douglas*.   Ms. Pride-Fort belongs to a protected class, was qualified to perform her job, and suffered an adverse employment action when UPS reduced her hours.  (*See* Doc. 20, p. 9); *Jones v. Aaron's Inc.*, 748 Fed. Appx. 907, 917 (11th Cir. 2018) (finding that reducing an hourly employee's hours was an adverse employment action because it caused the employee to earn less pay).  But Ms. Pride-Fort has not demonstrated that UPS treated a similarly situated employee of a different race or gender more favorably.

Ms. Pride-Fort points to Ms. Garrison, but Ms. Garrison is not a similarly situated employee because she performed different job duties, and she did not report to Mr. Little.  *Lukie v. Metlife Grp., Inc.*, No. 22-10967, 2024 WL 4471109, at *4 (11th Cir. Oct. 11, 2024) ("[A] similarly-situated comparator will ordinarily: have engaged in the same basic conduct as the plaintiff; been subject to the same employment policy; had the same supervisor; and shared the plaintiff's employment

14

or disciplinary history.")  (citing *Lewis v. City of Union City*, 918 F.3d 1213, 1227–28 (11th Cir. 2019) (en banc)).  Accordingly, UPS's treatment of Ms. Garrison is not probative of whether UPS discriminated against Ms. Pride-Fort.  *See Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1186 (11th Cir. 1984) ("[I]f an employer applies a rule differently to people it believes are differently situated, no discriminatory intent has been shown.") (quotation omitted).

Ms. Pride-Fort also points to Ms. Stanfield, but UPS did not treat Ms. Stanfield more favorably than Ms. Pride-Fort.  UPS's employment records demonstrate that Ms. Pride-Fort worked approximately 40 hours fewer than Ms. Stanfield in 2023 and worked approximately 25 more hours than Ms. Stanfield in 2024.  (*Compare* Doc. 19-3, pp. 64, 68 *with* Doc. 19-3, pp. 66, 70).  Ms. Pride-Fort worked more hours than Ms. Stanfield four months in 2023 and six months in 2024.  (*Compare* Doc. 19-3, pp. 64, 68 *with* Doc. 19-3, pp. 66, 70).  Ms. Pride-Fort and Ms. Stanfield each worked fewer hours in 2024 than they did in 2023.  (*Compare* Doc. 19-3, pp. 64, 68 *with* Doc. 19-3, pp. 66, 70).  Ms. Williams, another African American female part-time package center supervisor, worked more hours than Ms. Pride-Fort and Ms. Stanfield in 2023 and 2024.  (*See* Doc. 19-3, pp. 65, 69).  Given the variation in the package center supervisors' hours each month, the modest difference in Ms. Pride-Fort and Ms. Stanfield's total hours, and the number of hours Ms. Williams worked, no reasonable jury could find that the discrepancy between

15

Ms. Pride-Fort's and Ms. Stanfield's hours suggests that UPS treated Ms. Stanfield more favorably than Ms. Pride-Fort because of race.

Ms. Pride-Fort has not presented other evidence that would "allow a jury to infer intentional discrimination." *Jenkins*, 26 F.4th at 1250. Ms. Pride-Fort points to Mr. Sims's racially tinged comments and other incidents at the Florence center that she claims "raise[s] a reasonable inference of [UPS's] discriminatory intent." (*See* Doc. 23, pp. 12–15). But Ms. Pride-Fort has not explained why this evidence suggests that the relevant decision makers, UPS's upper-management, reduced Ms. Pride-Fort's hours because of her race or gender.

Moreover, the record demonstrates that UPS reduced Ms. Pride-Fort and other part-time employees' hours as part of a "cost-savings project[]." (*See* Doc. 19-1, p. 3, ¶ 9). Ms. Pride-Fort has not demonstrated that UPS's stated reason for reducing her hours was pretextual. *See Simmons v. United Parcel Serv. Inc*, No. 25-11261, 2026 WL 457812, at *3 (11th Cir. Feb. 18, 2026). And Ms. Pride-Fort "has not presented sufficient evidence for a reasonable jury to find that the 'real reason for the employment action was discrimination.'" *Simmons,* 2026 WL 457812, at *3 (quoting *Tynes*, 88 F.4th at 944). Accordingly, the Court will grant UPS summary judgment on Ms. Pride-Fort's discrimination claim.

***

To establish a Title VII hostile work environment claim, a plaintiff must demonstrate:

> [T]hat she belongs to a protected group; she has been subject to unwelcome harassment; the harassment was based on a protected characteristic of the employee[;] . . . the harassment "was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment"; and there is a basis for holding the employer liable.

*Mukhina v. Walmart, Inc.*, 162 F.4th 1128, 1133 (11th Cir. 2025) (quoting *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002)).[8]

"Title VII gives rise to liability for hostile work environment only in the case of a workplace that is 'permeated with discriminatory intimidation, ridicule, and insult.'" *Callahan v. City of Jacksonville*, 805 Fed. Appx. 749, 751 (11th Cir. 2020) (quoting *Miller*, 277 F.3d at 1276). "[C]onduct must be *extreme* to amount to a change in the terms and conditions of employment." *Weatherly v. ABC Legal, Inc.*, No. 23-11143, 2024 WL 2698023, at *9 (11th Cir. May 24, 2024) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (emphasis in *Weatherly*). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will

---

[8] Ms. Pride-Fort describes the UPS Florence Center as a "hostile work environment," but she does not list a hostile work environment claim among her causes of action in her complaint. (Doc. 1-1, pp. 1, 3–5, ¶¶ 2, 9, 11, 14–29). The Eleventh Circuit has instructed district courts to consider a plaintiff's claim that is not specifically pleaded if an allegation in the plaintiff's complaint puts the defendant on notice of the cause of action. *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1200 (11th Cir. 2015). Accordingly, the Court will consider the merits of Ms. Pride-Fort's hostile environment claim in light of the summary judgment evidence.

not amount to discriminatory changes in the terms and conditions of employment." *Callahan*, 805 Fed. Appx. at 751 (quoting *Faragher*, 524 U.S. at 788).

To establish that harassment is severe or pervasive, a plaintiff must demonstrate that she "'subjectively perceive[d]' the hostile work environment 'to be abusive'" and "'that a reasonable person would find [the environment] hostile or abusive.'" *Copeland v. Georgia Dep't of Corr.*, 97 F.4th 766, 775 (11th Cir. 2024) (quoting *Miller*, 277 F.3d at 1276) (alterations added). District Courts "consider four factors to determine whether harassment of an employee meets this objective requirement: (1) its frequency, (2) its severity, (3) whether it is 'physically threatening or humiliating,' and (4) whether it 'unreasonably interferes with . . . job performance.'" *Copeland*, 97 F.4th at 775 (quoting *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (en banc)).

Ms. Pride-Fort has not established that UPS subjected her to harassment based on race that was objectively severe or pervasive enough to affect her terms and conditions of employment.[9]

---

[9] Ms. Pride-Fort identifies one comment that appears related to her sex–Mr. Little's statement that Ms. Pride-Fort would "need to sit on Mr. Sim's lap if she wanted her vacation time moved." Mr. Little's statement amounts at best to an "offhand comment" and does not affect the terms and conditions of Ms. Pride-Fort's employment. *See Dar Dar v. Associated Outdoor Club, Inc.*, 248 Fed. Appx. 82, 85–86 (11th Cir. 2007) (holding that evidence of "two sexually inappropriate comments and two incidents of intentional buttocks touching" were not sufficient to establish a hostile work environment claim based on sex); *Mendoza*, 195 F. 3d at 1247–50 (holding that a female employee could not establish a hostile work environment claim where a male supervisor followed her around the workplace on several occasions, twice visibly stared at her groin area and

Ms. Pride-Fort experienced a severe incident of harassment when a UPS customer threatened her, but Ms. Pride-Fort has not established a basis for holding UPS liable for the customer's conduct. *Mukhina*, 162 F.4th at 1133. An employer is liable for a person other than a supervisor's harassing conduct "only if [the employer] knew or should have known of the harassing conduct but failed to take prompt remedial action." *See Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1302 (11th Cir. 2007) (quotation omitted). After Ms. Pride-Fort informed UPS that the customer who threatened her was at the Florence center, two supervisors– Mr. Little and Mr. Howell–took remedial action by returning to the center, cooperating with police, and barring the customer from returning. Accordingly, UPS is not liable for the customer's conduct.

Ms. Pride-Fort's remaining complaints do not demonstrate that she experienced severe or pervasive harassment. Mr. Sims's racially charged comments were "crude" and "boorish," but under binding precedent, they constitute offensive remarks rather than threatening or humiliating statements. *Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1336 (11th Cir. 2023). Additionally, Ms. Pride-Fort has not demonstrated that UPS employees frequently made such offensive comments to her. *See Simmons,* 2026 WL 457812, at *4; *compare* Ponsetta Simmons's

---

made a sniffing motion, and once rubbed his hip against her hip while touching her shoulder and smiling).

19

Deposition, 3:23-cv-01128-CLS (N.D. Ala.), (Doc. 24-1, pp. 19–20, tpp. 68:11–69:4, 69:11–22, 72:8–13) (indicating that Mr. Sims said, "you all eat the same food [as] my Mammy . . . more than once," commented on African American hair "all the time," and joked "about taking his dogs out for chicken . . . more than once") *with* Ms. Pride-Fort's Deposition, 3:24-cv-00739-MHH, (Doc. 28-2, p. 36, tp. 141:1–15), (indicating that Mr. Sims commented about "nappy" hair "on a day-to-day basis," commented on black culture, and "pretty often" referred to "his mammy").

Moreover, Ms. Pride-Fort has not explained how Mr. Sims's conduct interfered with her job performance. Ms. Pride-Fort testifies that Mr. Sims's harassment caused her to experience high blood pressure, anxiety, and depression. (Doc. 28-2, p. 53, tp. 194:2–17). Ms. Pride-Fort has not presented medical evidence that documents her physical impairments.[10] Nor has Ms. Pride-Fort described how her symptoms affected her work. Thus, Ms. Pride-Fort has not established a genuine issue of material fact regarding the extent to which Mr. Sims's conduct unreasonably interfered with her job performance. *C.f. Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 586 (11th Cir. 2000) (finding that alleged harassment would not have interfered with a reasonable employee's job performance where the employee testified that she suffered from physical manifestations of stress including depression, anxiety,

---

[10] Defense counsel indicates that Ms. Pride-Fort also failed to produce medical records documenting her impairments during discovery. (Doc. 24, p. 5).

fatigue, weight gain and that the manifestations affected her work and caused her to miss deadlines).

In short, the summary judgment evidence demonstrates that Mr. Sims engaged in "serious" and "inappropriate" conduct. *Simmons,* 2026 WL 457812, at *4. Still, Ms. Pride-Fort "has not offered enough evidence for a reasonable jury to find that the environment [Mr.] Sims created at the UPS Florence center was so 'severe or pervasive' that it 'alter[ed] the terms of [Ms. Pride-Fort's] employment.'" *Simmons,* 2026 WL 457812, at *4 (citing *Smelter v. S. Home Care Servs.*, 904 F.3d 1276, 1285 (11th Cir. 2018)). Accordingly, the Court will enter judgment for UPS on Ms. Pride-Fort's hostile environment claim.

***

Title VII prohibits employers from retaliating against an employee "because [s]he has opposed any practice" made unlawful by Title VII. 42 U.S.C. § 2000e-3(a). "As a starting point for any retaliation claim, a plaintiff needs to show . . . that the decisionmaker actually knew about the employee's protected expression." *Martin v. Fin. Asset Mgmt. Sys., Inc.*, 959 F.3d 1048, 1053 (11th Cir. 2020). Ms. Pride-Fort asserts that UPS retaliated against her after she complained to the EEOC in the spring of 2023. (Doc. 23, pp. 15–16). Ms. Pride-Fort has not provided evidence that UPS was aware that she had contacted the EEOC. (*See* Doc. 28-2, p.

21

52, tpp. 205:3–206:16).  Accordingly, the Court will enter judgment for UPS on Ms. Pride-Fort's retaliation claim.

**IV.**

For the reasons discussed above, the Court grants UPS's motion for summary judgment on Ms. Pride-Fort's Title VII discrimination, hostile work environment, and retaliation claims.  By separate order, the Court will enter a final judgment in favor of UPS.  The Clerk of Court shall please TERM Doc. 18.

**DONE** and **ORDERED** this April 10, 2026.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE